UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------- x
TOYYA BREWTON,                                          :
                                                       :        <u>MEMORANDUM AND ORDER</u>
                                Plaintiff,             :
                                                       :        05-CV-3574 (ENV) (RLM)
                -against-                               :
                                                       :
THE CITY OF NEW YORK, THE NEW YORK CITY  :
POLICE DEPARTMENT, POLICE OFFICER                      :
DETECTIVE DWIGHT HOVINGTON and POLICE                  :
OFFICER DETECTIVE FRANK MANNS, and POLICE :
OFFICERS JOHN DOES and JANE DOES (the last two :
names being fictitious, and who are employees of the   :
New York City Police Department who are not yet        :
identified),                                           :
                                                       :
                                Defendants.            :
----------------------------------------------------------------------- x
VITALIANO, D.J.

   Plaintiff Toyya Brewton brings this action pursuant to 42 U.S.C. § 1983, alleging

that defendants violated her rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth

Amendments to the United States Constitution by subjecting her to false arrest, unlawful

imprisonment, and malicious prosecution. She also raises pendent state claims, including

intentional infliction of emotional distress.

   Three defendants, the City of New York and Detective Dwight Hovington (the

"City Defendants") and Detective Frank Manns,[1] have now moved for summary judgment

pursuant to Rule 56. For the reasons set forth below, the City Defendants' motion is granted in

part and denied in part. Detective Manns's motion is granted in its entirety.

---

[1] Detective Manns filed a separate motion for summary judgment, which incorporates the
arguments set forth in the City Defendants' motion and provides additional bases for granting
summary judgment as to him.

1

## Background

The relevant facts are drawn from the submissions of the parties on the motions for summary judgment. To the extent there are any disputes as to fact, those disputes are noted.

This action arises out of the aftermath of a domestic incident report ("DIR") filed by Brewton with the New York Police Department ("NYPD"), at the 100th Precinct, on February 24, 2004, related to and prompted by an allegedly harassing phone call she claims to have received from her ex-boyfriend, Albert Regan. According to Brewton, she and Regan had been involved in an on-and-off relationship beginning in 1997. Their relations were often violent and, on more than one occasion, the NYPD was called to respond to their fighting. Correspondingly, Brewton purportedly filled out successive domestic incident reports with the NYPD which resulted in the issuance of successive orders of protection against Regan. Throughout their relationship, Regan also was in-and-out of jail for various offenses unrelated to his relationship with Brewton. The Brewton-Regan relationship finally ended in 2000.

On or around February 11, 2004, Brewton received a voice message on her answering machine at home, which stated: "Hello, Toyya, Toyya, are you there, is anyone there, Toyya, are you there." That message was preceded by a voice prompt stating that the conversation would be recorded. Brewton recognized the voice on the answering machine as Regan's. She believed that Regan was calling her from prison, because she recognized the voice prompt from prior occasions when she had spoken to Regan from prison. Almost two weeks later, on February 24, 2004, Brewton called Detective Manns, a NYPD police officer but also another former boyfriend, seeking advice with respect to the phone call.[2] Detective Manns went to Brewton's house later that day and listened to the message. He informed Brewton that if she

---

[2] Brewton and Detective Manns had ended their relationship approximately one year prior to this incident. They had not spoken thereafter until Brewton called him in connection with what she perceived to be Regan's threatening phone call.

felt she was being threatened she had the right to go to the local police precinct and fill out a complaint report.[3]

Later that day, Brewton went to the 100th Precinct stationhouse. Once there, Detective Manns directed Brewton to Police Officer Thomas Marrone, who assisted her in completing the DIR at issue. The "Victim's Statement" on the DIR, which appears to have been completed by Brewton, states as follows: "My ex-boyfriend called my home from jail looking for me and I had a domestic violent dispute with him in the past and I fear for me and my daughter's safety." The "Description of Incident" on the DIR, apparently completed by Officer Marrone, states:

> At TPO C/V present at 100 pct S/H states that her ex-boyfriend is currently incarcerated and he called her house and left a message on her machine. C/V further states she had an order of prot. against him and she does not know when he gets out, but she is in fear that he will & (sic) do something to her.

Brewton's DIR was subsequently directed to Detective Hovington, who conducted an investigation.

Detective Hovington's testimony and investigation notes indicate that his entire investigation took place on February 27, 2004. According to Detective Hovington, he first called Brewton at home but received no answer. Next, he performed a computer check on Regan, which indicated that Regan was out of jail on parole. The computer search did not indicate that

---

[3] Brewton and Detective Manns disagree on much of the details of this encounter. For example, Brewton contends that she called an official police phone number and asked to speak to Detective Manns, while Detective Manns testified at his deposition that Brewton called him on his cell phone. Brewton also claims that Detective Manns came to her apartment in uniform, while Detective Manns maintained that he was off duty and not in uniform at the time.

3

there was any history between Brewton and Regan.[4] Detective Hovington then called Regan's

parole officer, Laura Owens. Owens confirmed that Regan had been released from prison

approximately one month prior to the date on which the alleged phone call to Brewton was

made. Owens also told Detective Hovington that Regan was making regular visits to her office,

had full-time employment, and that he was starting a new family.[5] Regan then called Detective

Hovington himself. Detective Hovington informed Regan of Brewton's allegations. Regan

denied leaving the voice message and stated that he had not seen Brewton in five or six years.[6]

Detective Hovington then called Brewton and requested that she come to the

precinct. She arrived at approximately 1:30 pm. Later that afternoon, Brewton was formally

arrested and charged with falsifying a police incident report in the third degree, a misdemeanor

---

[4] Brewton accuses Detective Hovington of lying about the results of his computer search. In support of her allegation, she claims that she searched the NYPD records herself and found a complete history of her domestic violence reports against Regan, which she apparently attached to her affidavit. The City Defendants did not attach a printout of Detective Hovington's search result.

[5] Brewton objects to the Court's consideration of Detective Hovington's investigation notes on hearsay grounds. To the extent that the police report contains Detective Hovington's personal observations, the report itself is admissible as a public record pursuant to Fed. R. Evid. 803(8). Parsons v. Honeywell, 929 F.2d 901, 907 (2d Cir. 1991). To the extent that the report contains statements that Owens made to Detective Hovington, there is no double-hearsay problem, because, as discussed *infra*, the statements are being offered and considered only to demonstrate what information was known by Detective Hovington at the time Brewton was arrested—not whether that information was accurate. See Mroz v. City of Tonawanda, 999 F. Supp. 436, 462 (W.D.N.Y. 1998) ("An officer may rely on hearsay information in his determination of probable cause if there [is] a reasonable basis to credit the information."). The Court will not consider, however, the Owens affidavit submitted on reply simply to bolster Detective Hovington's report or offer an independent factual basis for relief not previously offered. Submission of an affidavit on reply for such purposes is inappropriate. See Aurora Loan Servs., Inc. v. Posner, Posner & Assocs., P.C., 513 F. Supp. 2d 18, 20 (S.D.N.Y. 2007) (striking portions of reply affidavit and attached exhibits, finding that the proponent of the documents "was aware of and in possession of these documents at the time they filed for summary judgment, and [] therefore could have included them in its papers").

[6] Brewton contends that this conversation never took place. Indeed, notwithstanding Detective Hovington's testimony, Brewton maintains that Regan was incarcerated on the date of the phone call.

under New York Penal Law § 240.50.

The picture painted by the parties of the events that occurred between the time that Brewton arrived at the precinct and the time that she was placed under formal arrest is as conflicted as the tales of what preceded her visit. The parties, moreover, have provided little to no information at all in their Rule 56.1 statements concerning the events leading up to the arrest. In spite of the failure of the parties to blaze a trail through the admissible proof, the Court has, nonetheless, conducted a careful review of the deposition testimony and affidavits,[7] and has found the proof, in large part, to be both externally and internally inconsistent. At least this much can be divined:

Upon arriving at the police station, Detective Hovington asked Brewton to accompany him to an interview room. He proceeded to interview her for approximately 15 minutes and then left the room. According to Detective Hovington, he did not believe at that time that Brewton was lying, but felt that there were inconsistencies in her story with respect to the time of the phone call, the date of the phone call and the location of the caller. Leaving the room was a mental strategy that he used, he said, to give her an opportunity to think about their conversation, before he questioned her again. Brewton does not deny that Detective Hovington left her in the interview room. In fact, she claims that she went outside the room to look for him. It was at this point, Brewton contends, that Detective Hovington shoved her back inside the room and threatened to put handcuffs on her if she moved again.

Detective Hovington questioned Brewton a number of times that afternoon, although the substance of these conversations remains unclear. In relevant part, Brewton claims that she called her house and played for Detective Hovington the tape of Regan's voice message;

---

[7]   In her opposition, Brewton submitted the complete transcripts from her own deposition and the depositions of Detective Manns and Detective Hovington. Brewton also submitted her own affidavit.

but Detective Hovington denies having heard the tape. Brewton also testified at her deposition that Detective Hovington stated to her that he had spoken to Regan and that Regan sounded like a nice young man who had moved on. She also quoted Detective Hovington as stating that "it's typical, you black women always want to see us black man in jail," though, curiously, in her affidavit, she attributes that very same statement to Detective Manns and not Detective Hovington.

After their third conversation, Detective Hovington informed Brewton that she would be placed under arrest. Brewton started to cry and asked to see Detective Manns. She also asked to call her mother, which she was permitted to do. After Brewton spoke to her mother, her mother spoke with Detective Hovington. According to Detective Hovington, plaintiff's mother stated that she did not understand why Brewton was being arrested and that she intended to call the Internal Affairs Bureau.

When Detective Manns arrived at the 100th precinct, sometime after 4 pm, he was informed that Brewton had been placed under arrest for filing a false report. He went to see Brewton in the interview room and told her that everything would be alright. According to Brewton, Detective Manns stated to her that the only reason she was being placed under arrest was because her mother had threatened to call Internal Affairs.

Brewton was held in the interview room for a number of hours before she was transported to Central Booking. She was eventually arraigned on her alleged violation of New York Penal Law § 240.50, which provides, in relevant part:

> A person is guilty of falsely reporting an incident in the third degree when, knowing the information reported, conveyed or circulated to be false or baseless, he: . . . 3. Gratuitously reports to a law enforcement officer or agency (a) the alleged occurrence of an offense or incident which did not in fact occur; or (b) an allegedly impending occurrence of an offense or incident which in fact is not about to occur; or (c) false information relating to an

6

actual offense or incident or to the alleged implication of some person therein.

N.Y. Penal Law § 240.50 (McKinney 2006).

## Discussion

1. Standard for Summary Judgment

A motion for summary judgment is granted only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The Court's responsibility in assessing the merits of a summary judgment motion is thus not to try issues of fact, but rather to "determine whether there *are* issues of fact to be tried." Sutera v. Schering Corp., 73 F.3d 13, 16 (2d Cir. 1995) (quoting Katz v. Goodyear Tire & Rubber Co., 737 F.2d 238, 244 (2d Cir. 1984)). In deciding such motions, the moving party bears the burden of demonstrating that there is no genuine issue as to any material fact, see, e.g., Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005), and the evidence presented will be construed liberally in favor of the party opposing the motion, see, e.g., Sec. Ins. Co. of Hartford v. Old Dominion Freight Line. Inc., 391 F.3d 77, 83 (2d Cir. 2004). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Hetchkop v. Woodlawn at Grassmere, Inc., 116 F.3d 28, 33 (2d Cir. 1997).

If the moving party meets its initial burden of demonstrating the absence of a disputed issue of material fact, the burden shifts to the nonmoving party to present "specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). The nonmoving party may not then rely solely on "conclusory allegations or unsubstantiated speculation" in order to defeat a motion

for summary judgment. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998). Rather, the nonmoving party must "make a showing sufficient to establish the existence of [each] element to that party's case . . . since a complete failure of proof concerning an essential element of . . . [the] case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 322-23. If the evidence favoring the nonmoving party is "merely colorable . . . or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

2. False Arrest

Defendants move for summary judgment on Brewton's false arrest claims on the ground that there was probable cause to arrest Brewton, or, alternatively, that the individual officers are entitled to qualified immunity because there was arguable probable cause to arrest her.

The elements of a false arrest claim under § 1983 and the Fourth Amendment are substantially similar to those of a false arrest claim under New York law. Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996). To prove the elements of false arrest, plaintiff must show: (1) that defendants intended to confine her; (2) that she was conscious of her confinement; (3) that she did not consent to be confined; and (4) that the confinement was not otherwise privileged. Singer v. Fulton County Sheriff, 63 F.3d 110, 118 (2d Cir. 1995); Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994). Probable cause "constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under [42 U.S.C] § 1983." Weyant, 101 F.3d at 852 (internal citations and quotations omitted). Even absent probable cause to arrest, a police officer will be entitled to qualified immunity if he can demonstrate that there was arguable probable cause for the arrest. Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004).

a) Probable Cause

Probable cause exists "when the arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." Singer, 63 F.3d at 119 (internal quotation omitted). Whether probable cause exists "turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him . . . and not on the officer's actual state of mind at the time the challenged action was taken." Maryland v. Macon, 472 U.S. 463, 470-71 (1985) (internal quotation omitted). Thus, the court's inquiry focuses solely on the facts available to the officer at the time of arrest. Ricciuti v. New York City Transit Auth., 124 F.3d 123, 128 (2d Cir. 1997); Dukes v. City of New York, 879 F. Supp. 335, 340 (S.D.N.Y. 1995) ("the soundness of the arrest hinges on the existence of probable cause at the time the arrest was made"). Facts subsequently learned by the officer, whether they buttress or belie the existence of probable cause, are irrelevant. See Ricciuti, 124 F.3d at 128. Moreover, "[o]nce a police officer has a reasonable basis for believing that there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." Id. (citing Baker v. McCollan, 443 U.S. 137, 145-46 (1979)).

Reviewing the evidence in this case, the Court is left mostly to unravel the parties' differing versions of events. The Court undertakes this analysis with a focus on the undisputed facts and mindful that, for purposes of the instant motions, the Court need only determine whether a genuine issue of material fact exists after viewing the evidence in the light most favorable to Brewton. The Court also is mindful that "[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment." Fishl v. Armitage, 128 F.3d 50, 55-56 (2d Cir. 1997).

In support of their motions for summary judgment, defendants contend that probable cause existed for Brewton's arrest because, prior to the arrest, the following information had been ascertained by Detective Hovington: (1) through his computer check and his conversation with Parole Officer Owens, Detective Hovington had determined that Regan was not incarcerated, but had been paroled prior to the date and time of the phone call; (2) having spoken to him, Detective Hovington found Regan to be credible when he denied making the phone call; and (3) Detective Hovington found Brewton to be incredible during her interview. Defendants argue, therefore, that Detective Hovington had probable cause to believe that Brewton had included false information in her police report, namely, the identity and location of the individual who called her.

In opposition, Brewton accuses Detective Hovington of fabricating and, in some instances, outright lying about the results of his investigation. She contends that a computer check would have revealed a history of domestic violence between Brewton and Regan. Further, she claims that Detective Hovington listened to the voice message while she was at the precinct, even though Detective Hovington denies it. Brewton also insists that she was only arrested after her mother called internal affairs.[8] Brewton, of course, also maintains that Regan was in jail on the date and time of the phone call. She thus argues that the there are material facts in dispute and that summary judgment is inappropriate.

For the most part, the allegations of fabrication by Detectives Hovington and Manns are wholly conclusory and irrelevant. Yet, a nonmovant is not required to score 100% on her objections. Even one material issue of fact in dispute is sufficient to defeat summary

---

[8] Brewton's argument on this point is nonsensical. According to Brewton's own deposition testimony, she only called her mother *after* she was informed that she was being placed under arrest. Brewton's argument that she was arrested as retribution for her mother's call to internal affairs is, therefore, disturbingly meritless. In any event, a police officer's subjective motivations are irrelevant to the probable cause inquiry. See Macon, 472 U.S. at 470-71.

judgment as to Brewton's arrest by Detective Hovington. And, with respect to whether Detective Hovington had probable cause regarding the scienter element of the crime for which Brewton was arrested, the material issues of fact are very much in dispute.

When conducting a probable cause inquiry, the court's duty is to look at the "totality of the circumstances." See United States v. Cruz, 834 F. 2d 47, 51 (2d Cir. 1987) (citing Illinois v. Gates, 462 U.S. 213, 238 (1983)). An arresting officer need not have concrete proof of each element of a crime to establish probable cause for an arrest. Rather, "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." Gates, 462 U.S. at 232. Courts have found, though, at least in certain circumstances, that probable cause must be satisfied with respect to the knowledge or intent elements of a crime. See United States v. Maday, No. CR-88-35E, 1989 WL 53027, at *5 (W.D.N.Y. May 16, 1989) (holding that probable cause must be satisfied with respect to scienter); Rudis v. City and County of San Francisco, 499 F.3d 1094, 1100 (9th Cir. 2007) (holding that "[w]ithout at least some evidence regarding the knowledge or intent elements of the crime, probable cause is necessarily lacking."); cf. McGuire v. City of New York, 301 F. Supp. 2d 333, 337 (S.D.N.Y. 2004) (analyzing whether arresting officer had probable cause to infer scienter); Mahase v. City of New York, 96 CV 6105, 2000 WL 263742, at *3 (E.D.N.Y. Jan. 5, 2000) (same).

Here, Brewton was arrested and charged with filing a false police report, *"knowing the information reported, conveyed or circulated to be false or baseless."* N.Y. Penal

Law 240.50(3)(c) (emphasis added).[9] Because reporting false information in a police incident report is not a crime absent the element of scienter, the Court finds that probable cause must be satisfied with respect to this element.[10] Indeed, to hold otherwise would leave vulnerable to arrest any individual who unknowingly provided false information in a police report, no matter how innocent the mistake. Such a result is untenable.

With that in mind, the Court's first task is to determine when the "arrest" took place for purposes of Brewton's false arrest claims. "[W]henever a police officer accosts an individual and restrain his freedom to walk away, he has 'seized' that person." Terry v. Ohio, 392 U.S. 1, 16 (1968). If a reasonable person would not feel free to leave police custody, an arrest has likely occurred. Id. Therefore, interpreting the facts in the light most favorable to Brewton, the Court determines that a seizure took place approximately 15 minutes after she arrived at the police station, when Detective Hovington allegedly pushed her into the interview room and threatened to handcuff her if she attempted to leave.[11] Consequently, the facts relevant on these motions to the probable cause inquiry are those facts known to Detective Hovington

---

[9] Notably, the City Defendants omit any reference to the statute's knowledge requirement in their briefing to this Court, stating only that "Penal Law §240.50(3) prohibits '[g]ratuitously report[ing] to a law enforcement officer or agency . . . (c) *false information relating to* an actual offense or incident or to *the alleged implication of some person therein.*'" (City Def.'s Br. at 9 (italics in brief; not in original).)

[10] As defendants correctly point out, probable cause is a defense to false arrest if there was probable cause to arrest under any statute, not only the statute that the arrestee was subsequently charged with. It is, though, a point of law without a factual anchor. Defendants have not pointed to any other statute under which there might have been probable cause to arrest Brewton, and the Court is aware of none.

[11] To be clear, the Court does not find that Brewton was arrested at this point. Police stations are secure and dangerous places. While interviewing Brewton with respect to her police report, Detective Hovington could have lawfully required her as a mere complainant to remain in the interview room and not wander about the stationhouse unescorted. On the other hand, he may have intended to confine her in furtherance of her formal arrest on a criminal charge. For purposes of defendants' summary judgment motions, however, the latter must be presumed since it is the version most favorable to the nonmovant.

prior to this earliest alleged confinement, *i.e.*, the information learned through his investigation of Brewton's DIR on the morning of February 27, 2004 and what was learned as a result of his first interview with Brewton.

Defendants place great emphasis on the fact that even prior to the confinement now determined by the Court to be relevant for purposes of the instant motions, Detective Hovington had learned, through credible sources, that Regan was out of jail on parole on the date that the phone call to Brewton was made. Defendants are correct that, based upon this fact alone, a police officer could have reasonable cause to believe that Brewton provided false information regarding the identity and location of the caller. But this fact alone is insufficient to raise an inference that Brewton *knowingly* misidentified the identity or location of the caller. What's more, there were other facts known to Detective Hovington at that very same moment which increased the likelihood that Brewton was unaware that Regan had been released from prison: (1) Regan had actually been in prison as recently as one month prior to the date of the alleged phone call, and, (2) harmoniously, Brewton's DIR expressly indicated a lack of certitude regarding Regan's jail status—while believing Regan was in prison, she said she "[did] not know when he gets out."

Although the facts surrounding Detective Hovington's first interview of Brewton are muddled at best, Detective Hovington's version of the interview standing by itself underlines the absence of probable cause to believe Brewton had knowingly provided false information. Specifically, Detective Hovington admitted in his deposition that, after his first interview with her (again, the relevant time frame for this analysis), he believed Brewton's story was inconsistent, but that he did not then believe that she was lying, that is, knowingly supplying false information, viz.:

Q: How long was that initial interview?

13

> A: The initial interview with Ms. Brewton was approximately ten
> to 15 minutes.
> Q: What happened after the interview?
> A: I left the room. I told her that I would be back.
> Q: Was there a reason why you left the room at that point?
> A: Yes.
> Q: What was the reason?
> A: It was a mental strategy that we use or I use.
>
> . . .
>
> When we feel that we have inconsistencies in stories from, whether
> it be a complainant or alleged perpetrator, and we're interviewing
> them in the room, we tend to leave the room to give that particular
> person time to think or to go over what they've just conversed with
> me. . . .
>
> . . .
>
> Q: So, in essence at that point you believed Ms. Brewton was
> lying?
> A: Not lying, inconsistencies with the story.

(Hovington Dep. at 57:15-59:4.)[12] In any event, the overall ambiguity surrounding what

actually took place at the precinct is sufficient to preclude summary judgment on plaintiff's false

arrest claims. These are precisely the type of he-said-she-said determinations best left to a jury.

Murphy v. Lynn, 118 F.3d 938, 947 (2d Cir. 1997) ("Where the question of whether an arresting

---

[12]  Likewise, that Detective Hovington spoke with Regan and believed his statement that he did
not call Brewton does not add to the requisite showing of probable cause. As an initial
matter, it was unreasonable for Detective Hovington to blindly credit Regan where, as here,
Regan's motives to lie were patent. Brewton's arrest arose out of Detective Hovington's
investigation into *Regan's* alleged unlawful conduct. Certainly, had Regan been harassing
Brewton and/or violating a protective order, he had every reason to deny making the phone
call.  See Jovanovic v. City of New York, No. 04 Civ. 8437 (PAC), 2006 WL 2411541, at *7
(S.D.N.Y. Aug. 17, 2006) (holding that when circumstances call a victim's veracity into
doubt "[an] officer has a duty to assess the reliability of the victim and . . . to investigate the
allegations and corroborate them," before his statement can serve as a basis for probable
cause); Mistretta v. Prokesch, 5 F. Supp. 2d 128, 133 (E.D.N.Y. 1998) (holding that police
officer had duty to assess the reliability of a victim's statement when there exists a prior
relationship between the victim and the alleged perpetrator). Moreover, even if Detective
Hovington had reasonably credited Regan when he denied making the call, there still appears
no basis to conclude that Brewton possessed the requisite scienter as a result of his
conversation with Regan absent testimony that Regan also informed him that he had told
Brewton that he was out of jail or had conveyed information to Detective Hovington that
could have led a reasonable police officer to conclude that Brewton had to be aware Regan
was out of jail.  No such claim is made.

officer had probable cause is predominantly factual in nature, as where there is a dispute as to the pertinent events, the existence *vel non* of probable cause is to be decided by the jury.").

    b) Qualified Immunity

        Even though Detective Hovington is not entitled to summary judgment on Brewton's false arrest claim because material questions of fact exist as to probable cause, he may still avoid liability and trial under the doctrine of qualified immunity. Qualified immunity shields a police officer from liability for damages if he can demonstrate that there was "arguable probable cause" for the arrest. Escalera, 361 F.3d at 743. "Arguable probable cause exists 'if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.'" Id. (quoting Golino v. City of New Haven, 950 F.2d 864, 870 (2d Cir. 1991)). As with the probable cause inquiry, the Court's focus is on the facts known to the officer at the time of the arrest. See, e.g., Cornett v. Brown, No. 04-CV-0754 (DGT) (LB), 2007 WL 2743485, at *8 (E.D.N.Y. Sept. 17, 2007).

        In this case, at the time of the arrest, Detective Hovington did not have any information to support an inference that Brewton knew Regan was out of jail at the time of the phone call and, thus, knowingly provided false information in her DIR. Based on even Detective Hovington's version of the facts and information available at the time of Brewton's confinement deemed by the Court to be the "arrest" relevant on these motions, a jury could find that it was not objectively reasonable for Detective Hovington to believe probable cause existed or that officers of reasonable competence could not disagree as to the absence of probable cause. Therefore, Detective Hovington's motion for summary judgment, including on the ground that he is entitled to qualified immunity, is denied.

3. Failure to Intervene

Brewton seeks to hold Detective Manns liable because he did not intervene to prevent her arrest. The law is well settled that a police officer "has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers." O'Neill v. Krzeminski, 839 F.2d 9, 11 (2d Cir. 1988). Failure to intervene to prevent an unlawful arrest can be grounds for liability under 42 U.S.C. § 1983. Id. As with other § 1983 claims, however, in order to recover against a defendant on this ground, a plaintiff must first overcome the hurdle of qualified immunity. Ricciuti, 124 F.3d at 129. A police officer may obtain summary judgment on qualified immunity grounds if he "show[s] that the only result a fair jury could reach is that reasonably competent police officers, faced with the information available to the non-intervening officer at the time of the arrest, could disagree about the legality of the arrest." Id.

Applying these principles, Detective Manns is entitled, at minimum, to qualified immunity. Detective Manns's role in Brewton's encounter with Detective Hovington and the criminal justice system was limited to listening to the voice message at Brewton's apartment, informing her of her right to report any harassment, and directing her to Officer Marrone to complete the DIR. He played no part in Detective Hovington's investigation, and thus had no basis to doubt that Detective Hovington had probable cause to arrest Brewton. Further, the undisputed facts demonstrate that Detective Manns did not even arrive at the 100th precinct until after Brewton was placed under formal arrest. Accordingly, the motion of Detective Manns for summary judgment is granted and the claims against him are dismissed.

4. Claims against the New York Police Department

Brewton has also named the New York Police Department as a defendant in this suit. The capacity of a city agency "to sue or be sued shall be determined . . . by the law of the

16

state where the court is located." See Fed. R. Civ. P. 17(b)(3). Pursuant to the New York City Charter, "[a]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the City of New York and not in that of any agency, except where otherwise provided by law." N.Y. City Charter, Ch. 17, § 396. It is thus "well established that a plaintiff's legal claims against the New York City Police Department must be addressed in a lawsuit against the City of New York." Escobar v. City of New York, No. 1:05-cv-3030-ENV CLP, 2007 WL 1827414, at *4 (E.D.N.Y. June 25, 2007) (citing Nance v. N.Y.C. Police Dep't, No. 06-cv-306, 2006 WL 1027128, at *2 (E.D.N.Y. Jan.30, 2006); Piferrer v. New York City Police Dep't, No. 98-cv-191, 1999 WL 169505, at *1 (E.D.N.Y. Mar.3, 1999); and Bailey v. New York City Police Dep't, 910 F. Supp. 116, 117 (E.D.N.Y. 1996)). Accordingly, even assuming, *arguendo*, that Brewton is successful in her false arrest claims, the NYPD is not amenable to suit for the acts of its police officers. Summary judgment on behalf of the NYPD is granted and plaintiff's claims, to the extent they are brought against the NYPD, are dismissed.

5. Municipal Liability

All of Brewton's claims brought directly against the City of New York must also be dismissed. It is black-letter law that a municipality may not be held liable for its employees' constitutional violations under a respondeat superior theory. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). Rather, it is only when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Id. "[T]o hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." Batista v. Rodriguez, 702 F.2d 393, 397 (2d Cir. 1983).

Brewton's attempts to meet these criteria are unavailing. As an initial matter, her wholly conclusory claim that the NYPD has a "well documented history of poorly trained officers who conduct illegal arrests" is altogether insufficient to establish municipal liability. See Porter v. City of New York, No. 1:03 CV 6463 (ENV) (LB), 2007 WL 1791149, at *7 (E.D.N.Y. June 19, 2007) (unsupported allegations regarding ACS policy are insufficient to establish municipal liability). Brewton's other claim, that the City of New York may be held liable because of its "fail[ure] to train its police officers with regard to N.Y.C.P.L. 140.10," is similarly deficient. Not only is this statute inapplicable to this case, but Brewton's claims are once again doomed by her failure to produce any proof whatsoever to support her basic allegation that the City of New York fails to properly train its officers. See Id. at *7. Given plaintiff's unmitigated failure to adduce any evidence to establish the existence of a municipal custom or policy, summary judgment in favor of the City is granted.

6. Gender Discrimination

Brewton also purports to bring claims under the Fourteenth Amendment alleging that she was discriminated against on the basis of gender and deprived of the right to equal protection. The Equal Protection Clause of the Fourteenth Amendment directs, in essence, that similarly situated individuals be treated alike. Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). To establish an equal protection violation, a plaintiff must prove purposeful discrimination directed at an identifiable or suspect class. See Giano v. Senkowski, 54 F.3d 1050, 1057 (2d Cir. 1995). A plaintiff also must demonstrate that similarly situated people were treated differently. See Gagliardi v. Village of Pawling, 18 F.3d 188, 193 (2d Cir. 1994).

Here, Brewton has not provided any evidence of conduct on the part of defendants that was directed at an identifiable or suspect class, or that similarly situated people were treated differently. Her discrimination claims are therefore dismissed.

7. Intentional Infliction of Emotional Distress

In order to make a showing of intentional infliction of emotional distress, a plaintiff must demonstrate that: (1) defendant's conduct toward plaintiff was so outrageous and shocking that it exceeded all reasonable bounds of decency as measured by what the average member of the community would tolerate; (2) plaintiff suffered severe emotional distress; (3) defendant's conduct caused such distress; and (4) defendant acted either (a) with the desire to cause such distress to plaintiff, (b) under circumstances known to defendant which made it substantially certain that that result would follow, or (c) recklessly and with utter disregard of the consequences. See Bender v. City of New York, 78 F.3d 787, 790 (2d Cir. 1996). "New York sets a high threshold for conduct that is 'extreme and outrageous' enough to constitute intentional infliction of emotional distress." Id. Emotional distress is severe when it is of such intensity and duration that no reasonable person should be expected to endure it.

Interpreting the facts in the light most favorable to Brewton, the Court concludes that defendants' alleged conduct is not the type of "extreme and outrageous" conduct sufficient to sustain a claim of intentional infliction of emotional distress. See Kirk v. Metropolitan Transp. Authority, No. 99 Civ. 3787 RWS, 2001 WL 258605 at *8 (S.D.N.Y. Mar. 14, 2001) (granting summary judgment in favor of defendants on intentional infliction of emotional distress claim where plaintiff alleged that officer treated him roughly, over-tightened his handcuffs, falsely accused him of a crime and threatened him with prosecution: "Although the acts [that the defendant police officer] is alleged to have committed certainly crossed the line of acceptable police practice, as fairly typical examples of excessive force, they do not rise to the level of 'outrageous' such as to support an IIED claim."); c.f. Mejia v. City of New York, 119 F. Supp. 2d 232, 284-87 (E.D.N.Y. 2000) (finding triable issue of fact as to existence of extreme and outrageous conduct where, in addition to allegedly using excessive force, arresting officer, who

lacked probable cause to arrest, subjected pregnant suspect to ethnic slurs, told her that her unborn child and other children would be taken away from her, and had her strip searched). Nor is Brewton's alleged harm, *i.e.*, that she was upset and crying during the arrest and now fears that the police will not help her, sufficiently serious to support such a claim. Summary judgment is thus appropriate on this basis alone.

In any event, to the extent that Brewton contends she suffered emotional distress as a result of the false arrest, her claim is encompassed entirely within other available tort remedies and is thus precluded under New York law. In <u>Fischer v. Maloney</u>, 43 N.Y.2d 553, 373 N.E.2d 1215, 402 N.Y.S.2d 991 (1978), the New York Court of Appeals suggested in dictum that the tort of intentional infliction of emotional distress may not be used where there is substantial overlap of that tort with other traditional torts: "[I]t may be questioned whether the doctrine of liability for intentional infliction of extreme emotional distress should be applicable where the conduct complained of falls well within the ambit of other traditional tort liability." <u>Id.</u> at 557-58. To date, the Second Circuit has recognized, but has not resolved, whether a claim for intentional infliction of emotional distress is truly barred as a matter of law when the underlying conduct is actionable under another theory of tort liability. <u>See</u> <u>Bender,</u> 78 F.3d at 791-92 (finding it unnecessary to resolve this state law issue).

Notwithstanding, relying on <u>Fischer,</u> state courts and federal district courts applying New York law have consistently held that the tort of intentional infliction of emotional distress may not be used as a substitute for an available traditional tort theory. <u>See, e.g.,</u> <u>Worytko v. County of Suffolk,</u> No. 03-CV-4767 (DRH) (ARL), 2007 WL 1876503, at *5-6 (E.D.N.Y. June 28, 2007) (dismissing in part plaintiff's claims for intentional infliction of emotional distress as duplicative of her claims for false arrest to the extent that plaintiff alleged that she suffered emotional distress from the arrests and their aftermath); <u>Leonard v. Reinhardt,</u>

20 A.D.3d 510, 799 N.Y.S.2d 118 (2d Dep't 2005) ("the cause of action alleging intentional

infliction of emotional distress should have been dismissed as duplicative of the cause of action

alleging malicious prosecution and assault and battery"). In accordance with these decisions,

because the conduct comprising Brewton's intentional infliction of emotional distress claim is

encompassed entirely within her state law claims for false arrest and malicious prosecution, this

cause of action must be dismissed for it does not lie as a matter of state law.[13]

8. Malicious Prosecution

"The elements of a malicious prosecution claim are: (1) the commencement or

continuation of a criminal proceeding by the defendant against plaintiff; (2) the proceeding

terminated in favor of the plaintiff; (3) lack of probable cause for commencing or continuing the

action; and (4) the defendant acted with malice." Rothstein v. Carriere, 373 F.3d 275, 282 (2d

Cir. 2004); Cook v. Sheldon, 41 F.3d 73, 79 (2d Cir.1994). The law in this Circuit is clear that

an adjournment in contemplation of dismissal defeats a malicious prosecution claim because

such a disposition is not a favorable termination. Rothstein, 373 F.3d at 287. About this fact,

---

[13]  Moreover, Brewton's pendent state law claims for intentional infliction of emotional distress and false arrest both appear to be barred by the applicable statute of limitations. New York General Municipal Law §§ 50-i, 50-e requires that a plaintiff file a notice of claim with respect to her state law claims within ninety days after the claim arose and commence the action within one year and ninety days from the date the cause of action accrued. See Lieber v. Village of Spring Valley, 40 F. Supp. 2d 525, 533 (S.D.N.Y. 1999). New York Civil Practice Law and Rules § 215(3) fixes a one-year statute of limitations for intentional torts. The instant action was filed on July 28, 2005, more than one year and five months after Brewton's claims accrued, on February 27, 2004. See Covington v. City of New York, 1999 WL 739910, *5 (S.D.N.Y. Sept. 22, 1999) (intentional infliction of emotional distress claim accrued on date of arrest); Rowe v. City of Rochester, No. 00-CV-6333 CJS, 2002 WL 31974537 (W.D.N.Y. Dec. 23, 3003) ("the New York statute of limitations for claims of false arrest and false imprisonment require that the suit be brought within one year after the arrest"). Accordingly, even if Brewton had complied with the notice of claim requirements (a fact not evident from her complaint or the motion papers), her state law claims for intentional infliction of emotional distress and false arrest would still be barred by the applicable statute of limitations.

there is no dispute—Brewton's criminal case was adjourned in contemplation of dismissal on June 30, 2004 and, ultimately, dismissed on December 29, 2004. Accordingly, summary judgment in favor of defendants on this claim is granted.[14]

### Conclusion

For the foregoing reasons, Detective Dwight Hovington's motion for summary judgment dismissing Brewton's claim under 42 U.S.C. § 1983 for false arrest is denied. The balance of Detective Hovington's motion for summary judgment is granted. The motions of the other defendants for summary judgment are granted in their entirety.

As to the claims surviving summary judgment, the parties are directed to contact Magistrate Judge Mann forthwith to schedule a final pretrial conference and the entry of a final pretrial order. Trial will commence with jury selection on June 23, 2008.

SO ORDERED.

Dated: Brooklyn, New York
      May 1, 2008

s/Eric N. Vitaliano
_____
ERIC N. VITALIANO
United States District Judge

---

[14] At a pre-motion conference before this Court, held on February 20, 2007, the parties agreed to submit a joint stipulation dismissing the claim of malicious prosecution, but have yet to do so.